# FOR PUBLICATION

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

STATE OF ALASKA,
                    *Plaintiff-Appellant,*

            v.

FEDERAL SUBSISTENCE BOARD;
MICHAEL FLEAGLE, Chairman,
Federal Subsistence Board; DIRK
KEMPTHORNE, Secretary of the
Interior; ED SCHAFER, Secretary of
the Department of Agriculture,
                    *Defendants-Appellees,*

CHEESH-NA TRIBAL COUNCIL; LARRY
SINYON,
    *Defendant-Intervenors-Appellees.*

No. 07-35723

D.C. No.
CV 06-0107 HRH

OPINION

Appeal from the United States District Court
for the District of Alaska
H. Russel Holland, District Judge, Presiding

Argued and Submitted
August 5, 2008—Anchorage, Alaska

Filed September 23, 2008

Before: Dorothy W. Nelson, A. Wallace Tashima, and
Raymond C. Fisher, Circuit Judges.

Opinion by Judge Tashima

13431

**COUNSEL**

Michael W. Seawright, Assistant Attorney General, Anchorage, Alaska, for the plaintiff-appellant.

Ellen J. Durkee, U.S. Department of Justice, Environment & Natural Resources Division, Washington, D.C., for the defendants-appellees.

Heather Kendall, Native American Rights Fund, Anchorage, Alaska, for the defendants-intervenors-appellees.

Douglas S. Burdin, Washington, D.C., for *amici curiae* Safari Club International, and Safari Club International Foundation.

James H. Lister, Birch, Horton, Bittner & Cherot, Washington, D.C., for *amicus curiae* Kenai Sportfish Association.

---

**OPINION**

TASHIMA, Circuit Judge:

Defendant-Appellee Federal Subsistence Board ("FSB" or "Board") administers the federal subsistence program at the heart of Title VIII of the Alaska National Interest Lands Conservation Act ("ANILCA"), 16 U.S.C. §§ 3111-26. In 2005, the FSB granted residents of Chistochina, a rural community in Southeast Alaska, a Customary and Traditional use determination ("C & T determination") for moose throughout Game Management Unit ("GMU") 12. The C & T determination permits Chistochina residents to harvest moose in GMU 12 under federal subsistence hunting regulations, which are more permissive than state hunting regulations.

Plaintiff-Appellant the State of Alaska ("Alaska") challenged the C & T determination in district court, contending that the FSB granted the determination in violation of the Administrative Procedure Act ("APA"), 5 U.S.C. § 706(2)(A). The district court granted summary judgment in favor of Defendants-Appellees FSB, the Chairman of the FSB, the Secretary of the Interior, the Secretary of the Department of Agriculture (together, "Federal Defendants"), and Defendant-Intervenors Cheesh-na Tribal Council, Chistochina's governing body, and Larry Sinyon, a Chistochina subsistence hunter ("Intervenors"). After a careful review of

the record, we find no reason to set aside the FSB's C & T determination. Because we may not substitute our own judgment for that of the FSB, *see Arrington v. Daniels*, 516 F.3d 1106, 1112 (9th Cir. 2008) (citing *Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402, 416 (1971), overruled on other grounds by *Califano v. Sanders*, 430 U.S. 99, 105 (1977)), we affirm.

## I.  ANILCA

Congress enacted ANILCA to further two ends. The first is:

> to preserve unrivaled scenic and geological values associated with natural landscapes; to provide for the maintenance of sound populations of, and habitat for, wildlife species of inestimable value to the citizens of Alaska and the Nation . . . ; to preserve in their natural state extensive unaltered arctic tundra, boreal forest, and coastal rainforest ecosystems; to protect the resources related to subsistence needs; to protect and preserve historic and archeological sites, rivers, and lands, and to preserve wilderness resource values and related recreational opportunities . . . ; and to maintain opportunities for scientific research and undisturbed ecosystems.

16 U.S.C. § 3101(b). The second, in order though not in priority, is "to provide the opportunity for rural residents engaged in a subsistence way of life to continue to do so." *Id.* § 3101(c).

In Title VIII of ANILCA, Congress sought to protect the subsistence way of life in the face of Alaska's growing population and the resultant pressure on fish and wildlife populations, and created a subsistence management and use program. *Id.* § 3111(3). The program grants a priority to subsistence use of resources, providing: "the taking on public lands of fish and wildlife for nonwasteful subsistence uses

shall be accorded priority over the taking on such lands of fish and wildlife for other purposes." *Id.* § 3114. Congress authorized the Secretary of the Interior and the Secretary of Agriculture (together, the "Secretaries") to promulgate regulations in furtherance of ANILCA's directives.[1] *Id.* § 3124.

The regulations establish a Federal Subsistence Management Program for all federal lands in Alaska. 50 C.F.R. § 100.1. The Secretaries created and charged the FSB with the "responsibility for administering the subsistence taking and uses of fish and wildlife on public lands." *Id.* § 100.10(a). In the course of its administration, the FSB "[d]etermine[s] which rural Alaska areas or communities have customary and traditional subsistence uses of specific fish and wildlife populations." *Id.* § 100.10(d)(4)(iii). To assist in these C & T determinations, the FSB establishes Regional Advisory Councils ("RACs"), which oversee subsistence resource regions and receive input from rural communities regarding subsistence uses in their regions. *Id.*. § 100.11(a). The RACs may evaluate C & T determination proposals, *Id.* § 100.11(c)(xi), and recommend to the FSB that it grant or deny a particular C & T determination, *Id.* § 100.11(c)(viii). *See also* 16 U.S.C. § 3115(a).

The FSB codifies C & T determinations at 50 C.F.R. § 100.24. Those communities with C & T determinations for particular fish stock or wildlife populations may take[2] them within the GMU,[3] or portion of a GMU, for which they have

---

[1]The Secretaries promulgated identical regulations, codified at 50 C.F.R., pt. 100, and 36 C.F.R., pt. 242. For the sake of simplicity, we cite to the regulations promulgated by the Secretary of the Interior at 50 C.F.R., pt. 100 throughout.

[2]"*Take* or *taking* as used with respect to fish or wildlife, means to pursue, hunt, shoot, trap, net, capture, collect, kill, harm, or attempt to engage in any such conduct." 50 C.F.R. § 100.4.

[3]The regulations divide Alaska into twenty-six GMUs. 50 C.F.R. § 100.4. The GMUs are codified in the State of Alaska hunting and trap-

a C & T determination pursuant to the federal subsistence hunting regulations found at 50 C.F.R. §§ 100.25-.28.

## II.  Facts and Procedural History

Chistochina is a rural community located in GMU 13C, a subunit of GMU 13, that borders GMUs 11 and 12. According to the 2000 Census, the community boasts ninety-three residents in thirty-seven households. GMU 12, the primary GMU at issue in this case, covers approximately 10,000 square miles.[4] Federal public lands, including the Tetlin National Wildlife Refuge and the Wrangell — St. Elias National Park and Preserve, comprise fifty-nine percent of GMU 12. State lands occupy approximately forty percent of the land. Less than one percent of the land is privately owned.

In 2004, the Cheesh-na Tribal Council, Chistochina's governing body, submitted a C & T determination proposal to the FSB. At the time of the proposal, there existed C & T determinations for moose within three areas of GMU 12:

> (A) south of a line from Noyes Mountain, southeast of the confluence of Tatschunda Creek to Nabesna River.

---

ping regulations. *Id.*; Alaska Admin. Code tit. 5, § 92.450. Alaska implemented ANILCA through state law until the Supreme Court of Alaska held that providing a subsistence priority for rural Alaskans, to the exclusion of other Alaskans, violated the Alaska Constitution. *See McDowell v. State*, 785 P.2d 1, 9 (Alaska 1989). The Secretaries then assumed responsibility for the implementation and administration of ANILCA, and incorporated the GMU scheme into the federal regulations. *See* 50 C.F.R. § 100.4.

[4]"Game Management Unit 12 consists of the Tanana River drainage upstream from the Robertson River, including all drainages into the east bank of the Robertson River, and the White River drainage in Alaska, but excluding the Ladue River drainage[.]" Alaska Admin. Code tit. 5, § 92.450(12).

(B) east of the Nabesna River and Nabesna Glacier, south of the Winter Trail from Pickerel Lake to the Canadian Border.

(C) remainder.[5]

50 C.F.R. § 100.24(a)(1) (2004). Chistochina was included in the C & T determination for moose within area A but not areas B and C. *Id.* In the 2004 proposal, the Cheesh-na Tribal Council asked the FSB to grant Chistochina a C & T determination for moose within areas B and C on the ground that Chistochina residents "customarily and traditionally hunted moose throughout Unit 12." In support of this claim, the Council represented that Chistochina residents had taken moose in "[a]ll areas east of the Nabesna river and south of the River Trail. This includes, but is not limited to rivers, lakes, and creeks in the Chisana area . . . and in the White River area."

The Office of Subsistence Management ("OSM") prepared an analysis of the proposal, which it forwarded to the Southcentral RAC and the Eastern Interior RAC.[6] After reviewing the proposal and hearing testimony, both RACs recommended granting a C & T determination for moose to Chistochina members throughout GMU 12. The FSB, during a public hearing, considered the proposal along with the OSM analysis, the recommendations of the RACs, and a positive recommendation from the Interagency Staff Committee of the OSM ("Staff Committee"). A representative from the Alaska Department of Fish and Game was the only party to express

---

[5]These three sections of GMU 12 are not formal subunits as are, for example, GMU 13 A-D. During the C & T determination process the FSB referred to the three areas as areas A-C. For the sake of simplicity, we follow suit.

[6]Both RACs reviewed the proposal because Chistochina is within the purview of the Southcentral RAC, but GMU 12 is within the purview of the Eastern Interior RAC.

any reservations. He asked the FSB to limit the C & T determination, averring that the Chistochina residents had only shown use of moose in *portions* of areas B and C and not *throughout* areas B and C. The FSB approved the proposal as submitted, granting Chistochina residents a C & T determination for moose in areas B and C of GMU 12.

Alaska requested reconsideration pursuant to 50 C.F.R. § 100.20(b), contending that historical and cultural data showed that Chistochina members harvested moose only in 2,500 square miles of GMU 12. Alaska proposed granting Chistochina a C & T determination for moose in the following area: "that portion [of GMU 12] that includes the drainage of the Nabesna River upstream from the mouth of Lick Creek, and the area south of and including the Pickerel Lake Winter Trail from Lick Creek to the Chisana River." The proposed area occupies area A, the eastern third of area B, and a small portion of area C bordering the Nabesna Road, Nabesna River, and Pickerel Lake.

The FSB denied the request for reconsideration, and Alaska filed the instant action, contending that in granting the C & T determination, the FSB violated the APA.[7] The Cheesh-na Tribal Council and Sinyon intervened shortly thereafter. On cross-motions for summary judgment, the district court granted summary judgment in favor of all Defendants. Alaska timely appeals.

### III.   Jurisdiction and Standard of Review

We have jurisdiction pursuant to 28 U.S.C. § 1291. We

---

[7]Alaska initially contended that the C & T determination violated ANILCA as well. The district court, however, held that Alaska lacked prudential standing to bring the claim because ANILCA only permits parties "aggrieved by a failure . . . to provide for the priority for subsistence uses" to bring suit. 16 U.S.C. § 3117(a). Alaska does not pursue its ANILCA claim on appeal.

review de novo the district court's determination on summary judgment that the FSB complied with ANILCA and its implementing regulations. *See Or. Natural Desert Ass'n v. Bureau of Land Mgmt.*, 531 F.3d 1114, 1130 (9th Cir. 2008). We must "hold unlawful and set aside" any agency action that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2).

"[W]e may not defer to an agency decision that 'is without substantial basis in fact.' " *Sierra Club v. EPA*, 346 F.3d 955, 961 (9th Cir.), *amended by* 352 F.3d 1186 (9th Cir. 2003) (quoting *Fed. Power Comm'n v. Fla. Power & Light Co.*, 404 U.S. 453, 463 (1972)). Thus, our "inquiry into the facts is to be searching and careful." *Citizens to Preserve Overton Park*, 401 U.S. at 416. Our ultimate posture, however, is deferential; we will uphold an agency's action if the agency " 'articulate[d] a rational connection between the facts found and the choice made.' " *Sierra Club*, 346 F.3d at 961 (quoting *Ariz. Cattle Growers' Ass'n v. U.S. Fish & Wildlife*, 273 F.3d 1229, 1236 (9th Cir. 2001)).

We will find an agency action arbitrary and capricious if:

> "the agency has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise."

*Ctr. for Biological Diversity v. Nat'l Highway Traffic Safety Admin.*, 2008 WL 3822966, at *14 (9th Cir. Aug. 18, 2008) (quoting *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983)). While we may not fabricate a rational basis for an agency's action, we will " 'uphold a decision of less than ideal clarity if the agency's path may reasonably be discerned.' " *Motor Vehicle Mfrs. Ass'n*, 463

U.S. at 43 (quoting *Bowman Transp., Inc. v. Arkansas-Best Freight Sys., Inc.*, 419 U.S. 281, 286 (1974)).

## IV.    Discussion

### A.    The FSB's fact-finding with respect to Chistochina's subsistence use of moose in GMU 12 was supported by substantial evidence.

[1] While Alaska argues vociferously that the FSB's fact finding was not supported by substantial evidence, the disagreements between the parties are ultimately legal, and not factual, in nature. Alaska concedes that the record supports a finding that Chistochina residents took moose for subsistence use in "that portion of [GMU 12] that includes the drainage of the Nabesna River upstream from the mouth of Lick Creek, and the area south of and including the Pickerel Lake Winter Trail from Lick Creek to the Chisana River." This area includes all of area A, more than a third of area B, and a small portion of area C and covers approximately 2,500 square miles of GMU 12.[8]

[2] When making the relevant C & T determination, the FSB did not find that Chistochina residents took moose throughout all 10,000 square miles of GMU 12. Rather, it found that Chistochina residents took moose in each of the three areas within GMU 12.[9] Finding no factual dispute

---

[8]Indeed, the record contains sufficient evidence that Chistochina residents have historically and traditionally taken moose in this area. Chistochina residents descended from members of a native Alaskan group that hunted near Chisana in area B and Nabesna in area C. Moose harvest data support moose taking by Chistochina residents near Pickerel Lake and east of the Nabesna River in area C between 1964 and 1984.

[9]The Cheesh-na Tribal Council and Sinyon contend that there is substantial evidence to support a finding that Chistochina residents took moose throughout all 10,000 square miles of GMU 12. The record does not support such a finding, but, more importantly, the FSB did not so find. We may not uphold an agency decision based on facts on which the

between the parties, we hold that the FSB's fact finding was supported by substantial evidence.

## B. The FSB properly considered specific moose populations.

Alaska further contends that the FSB's C & T determination was arbitrary and capricious because the FSB failed to consider a relevant factor, namely specific moose populations within GMU 12. The Federal Defendants contend that the FSB needed only to consider Chistochina residents' subsistence use of the moose species because "population" is synonymous with "species."

**[3]** Federal Defendants contend that their interpretation of "population" is due deference under *Chevron U.S.A. Inc. v. Natural Res. Def. Council, Inc.*, 467 U.S. 837, 843 (1984).[10] An official, legally binding interpretation is entitled to *Chevron* deference. *Miranda Alvarado v. Gonzales*, 449 F.3d 915, 922 (9th Cir. 2006) ("[T]he precedential value of an agency action [is] *the* essential factor in determining whether *Chevron* deference is appropriate."). We afford *Skidmore*[11] deference to official agency interpretations without the force of law. *Tablada v. Thomas*, 533 F.3d 800, 806 (9th Cir. 2008) (citing *United States v. Mead Corp.*, 533 U.S. 218, 228, 234 (2001)) (affording *Skidmore* deference to a Bureau of Prisons Program Statement, which formalized the agency's official interpretation of a statute).

**[4]** Federal Defendants have not interpreted "population" as

---

agency did not rely. *Arrington*, 516 F.3d at 1113 ("*Post hoc* explanations of agency action by appellate counsel cannot substitute for the agency's own articulation of the basis for its decision.") (citing *Fed. Power Comm'n v. Texaco, Inc.*, 417 U.S. 380, 397 (1974)).

[10]Intervenors agree.

[11]*Skidmore v. Swift & Co.*, 323 U.S. 134, 140 (1944).

synonymous with "species" in any legally-binding regulation or in any official agency interpretation of the regulation. Rather, this interpretation appears to be purely a litigation position, developed during the course of the present case. As such, we owe the interpretation no deference. *United States v. Trident Seafoods Corp.*, 60 F.3d 556, 559 (9th Cir. 1995) ("No deference is owed when an agency has not formulated an official interpretation of its regulation, but is merely advancing a litigation position."). We do not afford *Chevron* or *Skidmore* deference to litigation positions unmoored from any official agency interpretation because " 'Congress has delegated to the administrative official and not to appellate counsel the responsibility for elaborating and enforcing statutory commands.' " *Bowen v. Georgetown Univ. Hosp.*, 488 U.S. 204, 212 (1988) (quoting *Inv. Co. Inst. v. Camp*, 401 U.S. 617, 628 (1971)).

[5] When making a C & T determination, the FSB must "determine which fish stocks and wildlife populations have been customarily and traditionally used for subsistence." 50 C.F.R. § 100.16(a). Additionally, the regulations provide that the C & T determination "shall identify the specific community's or area's use of specific fish stocks and wildlife populations." *Id.*

[6] "Population" and "species," as used in 50 C.F.R. § 100.16(a), are not synonymous. The regulations define "fish and wildlife," as opposed to "fish *stocks* and wildlife *populations*," broadly as "any member of the animal kingdom." *Id.* § 100.4. The regulations also frequently refer to fish and wildlife without the limiting nouns "stock" and "population." *See, e.g., Id.* § 100.7(a) ("You may not use fish or wildlife or their parts, taken pursuant to the regulations in this part, unless provided for in this part."). In one definition, the regulations even use the two terms in conjunction: "*Conservation of healthy populations of fish and wildlife* means the maintenance of fish and wildlife resources . . . in a condition that . . . minimizes

the likelihood of irreversible or long-term adverse effects upon such populations and species." *Id.* § 100.4.

[7] The addition of the terms "stock" and "population" in 50 C.F.R. § 100.16(a) denotes a group smaller than a species. Specifically, the regulation directs the FSB to identify a community's use of "*specific* fish stocks and wildlife populations." *Id.* (emphasis added). In order for the FSB to have considered the relevant factors when making the C & T determination, the FSB must have considered Chistochina's subsistence use of specific moose populations, and not Chistochina's use of moose in general.

[8] Although we disagree with Federal Defendants' interpretation of "population," we conclude that, in this case, the FSB properly considered specific moose populations by considering Chistochina's historical and traditional taking of moose for subsistence use within GMU 12, areas B and C. Under 50 C.F.R. § 100.16(a), C & T determinations should "identify the specific community's or area's use of specific fish stocks and wildlife populations." The C & T determinations for moose in GMU 12 identified three specific moose populations, those in the three areas within GMU 12:

> (A) south of a line from Noyes Mountain, southeast of the confluence of Tatschunda Creek to Nabesna River.

> (B) east of the Nabesna River and Nabesna Glacier, south of the Winter Trail from Pickerel Lake to the Canadian Border.

> (C) remainder.

*Id.* § 100.24(a)(1) (2004). Thus, for all C & T determinations for moose within GMU 12 prior to 2004, the FSB considered the moose populations within these three specific areas.[12]

---

[12]The boundaries for the C & T determinations for moose within GMU 12 were revised in 2007. 50 C.F.R. § 100.24(a)(1) (2007). We express no opinion on the reason for or effect of the revision.

Because the FSB considered whether Chistochina took moose for subsistence use in each of these three areas when making the instant C & T determination, the FSB properly considered specific moose populations as directed by *Id.*. § 100.16(a).

### C.    The FSB's decision to add Chistochina to the already-delineated C & T determination areas for moose within GMU 12 was not arbitrary and capricious.

Alaska further contends that the FSB's decision to grant Chistochina residents a C & T determination for moose throughout GMU 12 was arbitrary and capricious because the facts only support historical moose harvesting in 2,500 square miles of GMU 12.[13] Rather than simply adding Chistochina residents to areas B and C in the already-existing C & T determinations for moose in GMU 12, Alaska argues that the FSB should have delineated a new area, one that corresponds more closely to the approximately 2,500 square miles in which Chistochina residents have traditionally taken moose.

Federal Defendants first contend that the FSB properly extended Chistochina's C & T determination for moose to the whole of GMU 12 because the Board, in its discretion, may grant a C & T determination for a species in *any* area as long as the community requesting the determination can demonstrate subsistence use of that species anywhere. In other words, Federal Defendants contend that neither ANILCA nor its implementing regulations require the FSB to limit C & T

---

[13]Alaska mischaracterizes the C & T determination as covering the entire 10,000 square miles of GMU 12. The regulations provide that the C & T determinations only apply to federal lands. 50 C.F.R. § 100.24(a) ("[R]ural Alaska residents of the listed communities, areas, and individuals have customary and traditional use of the specified species on Federal public land in the specified areas."). Thus, the relevant C & T determination includes only the approximately 5,900 square miles of federal lands within GMU 12.

determinations to the area in which a community has demonstrated subsistence use.[14]

**[9]** We find no merit to this argument. The regulations clearly tie C & T determinations to the specific locations in which wildlife populations have been taken. Federal Defendants contend that the definitions of "subsistence use" in ANILCA and "customary and traditional use" in the regulations do not tie such uses to geography. ANILCA provides:

> [T]he term "subsistence uses" means the customary and traditional uses by rural Alaska residents of wild, renewable resources for direct personal or family consumption as food, shelter, fuel, clothing, tools, or transportation; for the making and selling of handicraft articles out of nonedible byproducts of fish and wildlife resources taken for personal or family consumption; for barter, or sharing for personal or family consumption; and for customary trade.

16 U.S.C. § 3113. The regulations further define "customary and traditional use" as "a long-established, consistent pattern of use, incorporating beliefs and customs which have been transmitted from generation to generation. This use plays an important role in the economy of the community." 50 C.F.R. § 100.4.

**[10]** While these definitions do not directly tie subsistence or C & T *use* to a particular location, each C & T *determination* must be tied to a specific community or area and a specific wildlife population. The regulations provide: "[C & T] determinations shall identify the specific community's or area's use of specific fish stocks and wildlife populations." *Id.*

---

[14]Federal Defendants first adopted this argument in the course of the instant action; it is not supported by any official agency interpretation. Accordingly, we decline to defer to this interpretation of ANILCA and its implementing regulations. *See* Part IV.B, *supra.*

§ 100.16(a). Specific communities and areas and specific fish stocks and wildlife populations are, by definition, limited to specific geographic areas. The regulation that lists the C & T determinations further provides: "The [FSB] has determined that rural Alaska residents of the listed communities, areas, and individuals have customary and traditional use of the specified species on Federal public land *in the specified areas.*" *Id.* § 100.24(a) (emphasis added). A C & T determination is not a determination that a community or area has used a species for subsistence purposes. Rather, a C & T determination is a determination that a community or area has taken a species for subsistence use *within a specific area.*

[11] Additionally, the eight-factor analysis that the FSB is directed to apply when considering a community's use of a specific wildlife population requires the FSB to consider the geographic reach of the community and the community's use activities. The eight factors are:

> (1) A long-term consistent pattern of use, excluding interruptions beyond the control of the community or area;
>
> (2) A pattern of use recurring in specific seasons for many years;
>
> (3) A pattern of use consisting of methods and means of harvest which are characterized by efficiency and economy of effort and cost, conditioned by local characteristics;
>
> (4) The consistent harvest and use of fish or wildlife as related to past methods and means of taking; near, or reasonably accessible from, the community or area;
>
> (5) A means of handling, preparing, preserving, and storing fish or wildlife which has been traditionally

used by past generations, including consideration of alteration of past practices due to recent technological advances, where appropriate;

(6) A pattern of use which includes the handing down of knowledge of fishing and hunting skills, values, and lore from generation to generation;

(7) A pattern of use in which the harvest is shared or distributed within a definable community of persons; and

(8) A pattern of use which relates to reliance upon a wide diversity of fish and wildlife resources of the area and which provides substantial cultural, economic, social, and nutritional elements to the community or area.

*Id.* § 100.16(b). Factors (1)-(3) and (6)-(8) refer to a "pattern of use." This use is not the use of a species in general. Rather, the "use" is the "community's or area's use of specific fish stocks and wildlife populations," as specified in subsection (a). *Id.* § 100.16(a).[15] Thus, six of the eight factors direct the FSB to consider use relative to a specific wildlife population or fish stock, and, by extension, relative to the geographic reach of that population or stock. Geographic limitations to the C & T determination are also explicit in factor (4), which directs the FSB to consider "[t]he consistent harvest and use of fish or wildlife . . . near, or reasonably accessible from, the community or area." *Id.* § 100.16(b)(4).

**[12]** Federal Defendants further contend that requiring a geographic basis for a C & T determination works at cross purposes with ANILCA because ANILCA was enacted to

---

[15]We note also, however, that a community's or area's use of a species in general may be relevant to that community's or area's use of a specific population of that species.

protect the subsistence lifestyle enjoyed by rural Alaskans, not to limit subsistence use to the traditional reach of those rural communities. We do not find this argument convincing. As we noted previously, ANILCA serves a dual purpose: protecting and preserving the subsistence lifestyle and protecting and preserving wildlife. 16 U.S.C. § 3101(b)-(c). Granting C & T determinations that are limited to the areas in which communities have traditionally harvested a resource serves both purposes. The geographic limitation protects the subsistence activities traditionally practiced by rural Alaskans and protects species by ensuring that only those communities that have traditionally taken from a population are given a priority to do so in the future.

[13] In fact, the alternative proposed by Federal Defendants would give the FSB the discretion to grant a rural community a state-wide C & T determination for a species as long as that community could demonstrate a subsistence use of that species. There is no support in ANILCA or its implementing regulations for such unfettered discretion. Moreover, the resulting pressures on fish and wildlife could threaten the continued viability of specific fish stock and wildlife populations and the communities that depend on those populations for subsistence use. Thus, we conclude that the FSB's decision to grant Chistochina a C & T determination for moose in areas B and C of GMU 12 cannot be supported simply by a finding that Chistochina residents used moose for subsistence purposes.

Prior to this litigation, the FSB surely agreed. The FSB's analysis of Chistochina's proposal focused entirely on whether Chistochina residents took moose within areas B and C of GMU 12. The proposal template used by Chistochina, and created by the FSB, directs an applicant for a C & T determination to describe *where* the resource in question has been harvested. The staff analysis recommended granting the C & T determination because the facts demonstrated "that residents of Chistochina have used moose in [areas B and C]

since the late 19th century." Indeed, if the FSB simply needed to find that the Chistochina community had a C & T use of moose anywhere in order to extend Chistochina's C & T determination to all of GMU 12, no deliberative process would have been necessary. Chistochina already had a C & T determination for moose in GMU 12 area A and GMUs 11 and 13. The record shows that the entire purpose of the C & T determination process was to determine whether Chistochina residents demonstrated C & T use of moose within areas B and C of GMU 12. If the FSB had not so found, we doubt that it would have granted Chistochina residents a C & T determination for moose in those areas.

[14] Federal Defendants further contend that the FSB's line-drawing decision was not arbitrary and capricious because it was rationally based on administrative convenience. Although a representative from the Alaska Department of Fish and Game proposed a narrower C & T determination, the FSB declined to create a new C & T determination area within GMU 12 for Chistochina because a new area would provide "no additional benefit to management." The Staff Committee recommendation explained the use of both whole units and subdivisions by explaining that differences in classification "reflect differences in the intensity of management required for either biological conservation or allocation purposes." Further, in response to Alaska's request for reconsideration, the FSB pointed out that Alaska had previously "discouraged the Board from subdividing units so as to avoid creating a patchwork of customary and traditional use determinations," and argued that using established units would be clearer to the public than providing individual maps for individual C & T determinations.

[15] While the FSB did not explicitly state what it considered the benefit to management, we can reasonably discern the benefit from the record. If the FSB had to restrict every C & T determination to the precise area in which a rural community had demonstrated C & T use of a wildlife population,

the C & T determinations would quickly become unmanageable. For example, if the three C & T determination areas for moose within GMU 12 were replaced by a separate C & T determination area for each rural community within GMU 12, GMU 13, GMU 11 north of the sixty-second parallel, Dot Lake, Healy Lake, and Chickaloon[16] there could easily be a dozen or more unique C & T determinations for GMU 12 alone. Multiply the effect of those C & T determinations by the number of GMUs in Alaska — twenty-six — and it is readily apparent that such a system would soon be very difficult, if not impossible, to manage. Thus, we conclude that the FSB's determination that there exists a benefit to management to limiting the number of C & T determination areas within GMU 12 provided an additional rational basis for the FSB's decision.[17]

## D.    The C & T determination does not violate ANILCA's limitations and savings clause.

ANILCA contains a limitations and savings clause that provides, in relevant part:

Nothing in this subchapter shall be construed as —

. . .

---

[16]These are the communities that currently enjoy a C & T determination for moose within some portion of GMU 12. 50 C.F.R. § 100.24(a)(1) (2007).

[17]Alaska further contends that administrative convenience cannot provide a basis for the broader C & T determination because the determination infringes on state sovereignty. Alaska avers that it had to further restrict moose hunting on state lands in GMU 12 due to the added pressure on the resource from Chistochina subsistence hunters. Alaska's argument fails because the federal C & T determinations only affect wildlife resources on federal lands, not state lands. While moose do not adhere to federal and state boundaries, federal regulation of wildlife on federal land does not encroach on Alaska's sovereignty.

(3) authorizing a restriction on the taking of fish and wildlife for nonsubsistence uses on the public lands (other than national parks and park monuments) unless necessary for the conservation of healthy populations of fish and wildlife . . . , to continue subsistence uses of such populations, or pursuant to other applicable law[.]

16 U.S.C. § 3125. Alaska contends that the instant C & T determination places restrictions on nonsubsistence taking because granting Chistochina residents a federal subsistence priority to take moose throughout GMU 12 increases moose taking and thus necessitates greater conservation efforts by the state.

[16] State hunting regulations for GMU 12 promulgated after the C & T determination for Chistochina in areas A and B contained more restrictions than the regulations in place prior to the C & T determination.[18] This fact, however, does not demonstrate that the C & T determination authorizes a restriction on the nonsubsistence use of moose in GMU 12. A C & T determination does not limit nonsubsistence use; it simply allows for subsistence use. ANILCA's limitation provision does not prevent the FSB from regulating subsistence use simply because a collateral effect of the regulation might cause a separate regulatory body to place restrictions on nonsubsistence use. It only prohibits the agency itself from limiting nonsubsistence use.

---

[18]For example, state regulations for the 2005-2006 hunting season restricted the moose take from August 24-28 to "one bull with spike-fork antlers or 50-inch antlers or antlers with 4 or more brow tines on one side" in "[t]hat portion drained by the Little Tok River upstream from and including the first eastern tributary from the headwaters of Tuck Creek." Alaska Admin. Code tit. 5, § 85.045 (2005). Regulations for the 2006-2007 hunting season tripled the area subject to this restriction. Alaska Admin. Code tit. 5, § 85.045 (2006) (applying the restriction on the same dates to "[t]hat portion in the Tok River drainage upstream from the Tok cutoff bridge").

## V.   Conclusion

[17] While we do not agree with several of the arguments advanced by Federal Defendants, we ultimately conclude that the FSB's decision to grant Chistochina residents a C & T determination for moose in GMU areas B and C was not "arbitrary and capricious, an abuse of discretion, or otherwise not in accordance with law" under the APA. 5 U.S.C. § 706(2)(A). Deferring to the agency's decision, we affirm the district court's order granting summary judgment to all Defendants.[19]

The judgment of the district court is **AFFIRMED.**

---

[19]Intervenors' request for attorney's fees under ANILCA, 16 U.S.C. § 3117(a), is denied because Alaska's claim arises under the APA and not ANILCA. *See* footnote 7, *supra*, and accompanying text.