**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

FRIENDS OF ALASKA NATIONAL
WILDLIFE REFUGES; THE WILDERNESS
SOCIETY; DEFENDERS OF WILDLIFE;
NATIONAL AUDUBON SOCIETY;
WILDERNESS WATCH; CENTER FOR
BIOLOGICAL DIVERSITY; NATIONAL
WILDLIFE REFUGE ASSOCIATION;
ALASKA WILDERNESS LEAGUE;
SIERRA CLUB,
    *Plaintiffs-Appellees*,

v.

DEBRA HAALAND, in her official
capacity as Secretary of the U.S.
Department of the Interior; U.S.
DEPARTMENT OF THE INTERIOR;
UNITED STATES FISH AND WILDLIFE
SERVICE,
    *Defendants-Appellants*,

and

KING COVE CORPORATION;
AGDAAGUX TRIBE OF KING COVE;
NATIVE VILLAGE OF BELKOFSKI;
STATE OF ALASKA,
    *Intervenor-Defendants*.

No. 20-35721

D.C. No.
3:19-cv-00216-
JWS

FRIENDS OF ALASKA NATIONAL
WILDLIFE REFUGES; THE WILDERNESS
SOCIETY; DEFENDERS OF WILDLIFE;
NATIONAL AUDUBON SOCIETY;
WILDERNESS WATCH; CENTER FOR
BIOLOGICAL DIVERSITY; NATIONAL
WILDLIFE REFUGE ASSOCIATION;
ALASKA WILDERNESS LEAGUE;
SIERRA CLUB,
                    *Plaintiffs-Appellees*,

                v.

DEBRA HAALAND, in her official
capacity as Secretary of the U.S.
DEPARTMENT OF THE INTERIOR; U.S.
DEPARTMENT OF THE INTERIOR;
UNITED STATES FISH AND WILDLIFE
SERVICE,
                    *Defendants*,

STATE OF ALASKA,
                    *Intervenor-Defendant*,

                and

KING COVE CORPORATION;
AGDAAGUX TRIBE OF KING COVE;
NATIVE VILLAGE OF BELKOFSKI,
        *Intervenor-Defendants-Appellants*.

No. 20-35727

D.C. No.
3:19-cv-00216-
JWS

| | |
|---|---|
| FRIENDS OF ALASKA NATIONAL WILDLIFE REFUGES; THE WILDERNESS SOCIETY; DEFENDERS OF WILDLIFE; NATIONAL AUDUBON SOCIETY; WILDERNESS WATCH; CENTER FOR BIOLOGICAL DIVERSITY; NATIONAL WILDLIFE REFUGE ASSOCIATION; ALASKA WILDERNESS LEAGUE; SIERRA CLUB, *Plaintiffs-Appellees*, | No. 20-35728 D.C. No. 3:19-cv-00216-JWS OPINION |

v.

DEBRA HAALAND, in her official capacity as Secretary of the U.S. Department of the Interior; U.S. DEPARTMENT OF THE INTERIOR; UNITED STATES FISH AND WILDLIFE SERVICE,
                    *Defendants*,

KING COVE CORPORATION; AGDAAGUX TRIBE OF KING COVE; NATIVE VILLAGE OF BELKOFSKI,
          *Intervenor-Defendants*,

and

STATE OF ALASKA,
     *Intervenor-Defendant-Appellant*.

Appeal from the United States District Court
for the District of Alaska
John W. Sedwick, District Judge, Presiding

Argued and Submitted August 4, 2021
Anchorage, Alaska

Filed March 16, 2022

Before:  Kim McLane Wardlaw, Eric D. Miller, and
Bridget S. Bade, Circuit Judges.

Opinion by Judge Miller;
Dissent by Judge Wardlaw

## SUMMARY[*]

### Alaska National Interest Lands Conservation Act

The panel reversed the district court's judgment, which set aside a land-exchange agreement between the Secretary of the Interior and King Cove Corporation, an Alaska Native village corporation, and remanded.

King Cove Corporation wishes to use the land it will obtain in the exchange to build a road through the Izembeck National Wildlife Refuge to allow access to the City of Cold Bay.  The residents of King Cove sought to build the road to access Cold Bay's larger, all-weather airport to facilitate medical evacuations.

In 2019, Secretary David Bernhardt approved a land exchange agreement, finding that the exchange comported

---

[*] This summary constitutes no part of the opinion of the court.  It has been prepared by court staff for the convenience of the reader.

with the purposes of the Alaska National Interest Lands Conservation Act ("ANILCA").

The panel held that the Secretary's analysis of ANILCA's statutory purposes was correct. Congress gave the Secretary discretion to strike an appropriate balance between environmental interests and "economic and social needs." 16 U.S.C. § 3101(d). The panel held that Secretary Bernhardt exercised that discretion when he found that, without a road, the economic and social needs of the people of King Cove would not be adequately met. The panel further held that the district court's reading of ANILCA was contrary to the Supreme Court's decision in *Sturgeon v. Frost*, 139 S. Ct. 1066 (2019). The panel concluded that the Secretary appropriately weighed the economic and social needs of Alaskans against the other statutory purposes in deciding whether to enter the land-exchange agreement.

The panel disagreed with the district court's conclusion that Secretary Bernhardt violated the Administrative Procedure Act ("APA") by departing from the position of his predecessor, Secretary Sally Jewell, on the land exchange without adequate explanation. Secretary Bernhardt acknowledged the competing policy considerations and the prior findings that keeping the area roadless would best protect the habitat and wildlife of the Izembek Refuge. But after examining the most recent available information about alternatives to a road, Secretary Bernhardt concluded that the value of a road to the King Cove community outweighed the harm that it would cause to environmental interests. The panel held that there was no reason to look beyond the valid justification that Secretary Bernhardt offered. Even if it was necessary to review Secretary Bernhardt's assessment of the facts, the panel would not agree with the district court that

Secretary Bernhardt arbitrarily contradicted prior agency findings.

Finally, the panel considered whether the land-exchange agreement was subject to the special procedures that ANILCA required for the approval of transportation systems. Title XI of ANILCA sets forth provisions that require an agency approving a transportation system to engage in a process of public consultation and make findings on various issues. 16 U.S.C. § 3164(g). The Secretary did not follow this process. The panel held that the Secretary did not have to follow the process because section 3192(h), the land-exchange provision that he invoked, was not an "applicable law" for purposes of Title XI. The panel did not need to consider the alternative argument advanced by the State of Alaska that the land exchange was exempted from Title XI by 16 U.S.C. § 3170(b).

Judge Wardlaw dissented. She would hold that the district court properly concluded that Secretary Bernhardt's decision to accede to King Cove's wish to build a road through Izembeck National Wildlife Refuge, despite the Department of the Interior ("DOI")'s long history of considering the impacts of the road and prior ruling against the road based on the detrimental effects on Izembek's ecological resources, violated both the APA and ANILCA. Secretary Bernhardt's memorandum contradicts key findings of the 2013 Record of Decision (ROD). Moreover, although the DOI purports to have the authority to enter the 2019 land-exchange agreement under ANILCA, in fact the agreement fails to advance ANILCA's stated purposes, and DOI failed to follow the procedural requirements set forth in Title XI of ANILCA. Judge Wardlaw would set aside the land exchange.

**COUNSEL**

Michael T. Gray (argued), David Gunter, and Davené D. Walker, Attorneys; Eric Grant, Deputy Assistant Attorney General; Jonathan D. Brightbill, Principal Deputy Assistant Attorney General; United States Department of Justice; Environment and Natural Resources Division; Jacksonville, Florida; Kenneth M. Lord, Attorney, United States Department of the Interior, Anchorage, Alaska; for Defendants-Appellants.

Steven W. Silver, Robertson, Monagle, and Eastaugh, PC, Reston, Virginia; James F. Clark, Law Offices of James F. Clark, Juneau; for Intervenor-Defendants/Intervenor-Defendants-Appellants King Cove Corporation, Agdaagux Tribe of King Cove, and Native Village of Belkofski.

Sean Lynch (argued) and Mary Hunter Gramling, Assistant Attorneys General; Clyde "Ed" Sniffen, Jr., Acting Attorney General; Office of the Alaska Attorney General, Juneau, Alaska, for Intervenor-Defendant/Intervenor-Defendant-Appellant State of Alaska.

Bridget Psarianos (argued) and Brook Brisson, Trustees for Alaska, Anchorage, Alaska, for Plaintiffs-Appellees.

**OPINION**

MILLER, Circuit Judge:

Several environmental organizations challenge a land-exchange agreement between the Secretary of the Interior and King Cove Corporation, an Alaska Native village corporation. King Cove Corporation wishes to use the land it will obtain in the exchange to build a road through the Izembek National Wildlife Refuge to allow access to the city of Cold Bay. The district court set aside the agreement. We reverse and remand.

**I**

The Native Village of King Cove and the city of Cold Bay, Alaska, are located near the southwestern end of the Alaska Peninsula. They are about 18 miles apart as the crow flies (or perhaps the raven—the area is outside of the range of the American crow). There is no road between them, and they are accessible to each other and to the rest of Alaska only by air or sea.

King Cove has just under 1,000 residents. It is home to the Agdaagux Tribe of King Cove and the Native Village of Belkofski, and about one-third of its residents are Alaska Natives. King Cove has limited medical facilities, so residents facing medical emergencies that require hospitalization must go to Anchorage or Seattle. The King Cove airport is small, dangerously close to high mountains, and frequently closed by bad weather. For several decades, the residents of King Cove have sought to build a road to Cold Bay to access its larger, all-weather airport to facilitate medical evacuations.

The proposed road would run through the Izembek National Wildlife Refuge. The refuge consists of tundra, wetlands, and lagoons, including the Izembek Lagoon, which contains one of the world's largest eelgrass beds. The refuge is an important habitat for birds, supporting almost all of the world's population of Pacific black brant, as well as emperor geese, Steller's eiders (a threatened species in the United States), and the world's only non-migratory population of tundra swans. It is also home to caribou, brown bears, and other mammals. Much of the refuge is designated as wilderness. So long as it retains that designation, no road may be built through it. 16 U.S.C. § 1133(c).

In 2009, Congress authorized the Secretary of the Interior to conduct a land exchange with King Cove Corporation under which King Cove Corporation would transfer land to the United States and, in return, the United States would transfer "all right, title, and interest of the United States" in a portion of the Izembek Refuge to allow the construction of a "single-lane gravel road between the communities of King Cove and Cold Bay" to "be used primarily for health and safety purposes (including access to and from the Cold Bay Airport) and only for noncommercial purposes." Omnibus Public Land Management Act of 2009, Pub. L. No. 111-11, §§ 6402(a), 6403(a)(1)(A), 123 Stat. 991, 1178, 1180. The statute instructed the Secretary to study the environmental impact of a road and to determine whether an exchange would be in the public interest. *Id.* § 6402(b)(2), (d)(1), 123 Stat. at 1178–79. It provided that the authority for construction of a road would expire in seven years unless a construction permit had been issued by then. *Id.* § 6406(a), 123 Stat. at 1182.

In 2013, Secretary Sally Jewell decided not to proceed with the exchange. The Secretary stated that the exchange

presented "difficult and controversial issues of public policy" and that she had weighed "the concern for more reliable methods of medical transport from King Cove to Cold Bay" against the threat to "a globally significant landscape that supports an abundance and diversity of wildlife." She acknowledged that "proponents of the proposed road believe it would be a reliable method of transport in most weather conditions, but conclude[d] that other viable, and at times preferable, methods of transport remain and could be improved to meet community needs." Such alternatives, she said, included "fishing vessels . . . , air service, and ferry service" and "an alternative marine-road transportation link" via landing craft. She also noted that between 2007 and 2010, a hovercraft had been used for medical evacuations from King Cove to Cold Bay, successfully completing at least 22 evacuations. Although that service was suspended because of "cost and reliability concerns," the Secretary nevertheless determined that "[a]ir, hovercraft, and ferry may be more expedient than driving." The Secretary also found that "construction of a road through the Izembek National Wildlife Refuge would lead to significant degradation of irreplaceable ecological resources that would not be offset by the protection of other lands to be received under an exchange." Those harms would occur even if the road were restricted to noncommercial use.

In 2018, Secretary Ryan Zinke changed course and approved a land-exchange agreement. By then, the Secretary's authority under the 2009 Act had expired, so he relied on a provision of the Alaska National Interest Lands Conservation Act (ANILCA), Pub. L. No. 96-487, 94 Stat. 2371 (1980), allowing him, "in acquiring lands for the purposes of [ANILCA]," to exchange lands with Alaska Native village corporations. 16 U.S.C. § 3192(h)(1). Under the agreement, King Cove Corporation would transfer to the

United States certain lands within the Izembek and Alaska Peninsula National Wildlife Refuges and relinquish its selection rights to certain other lands within the Izembek Refuge; in exchange, it would receive a corridor of less than 500 acres through the Izembek Refuge.

Several environmental groups—the same plaintiffs as in this case—filed suit in the District of Alaska to challenge Secretary Zinke's decision. The district court vacated the land-exchange agreement. *Friends of Alaska Nat'l Wildlife Refuges v. Bernhardt*, 381 F. Supp. 3d 1127, 1144 (D. Alaska 2019). It held that Secretary Zinke's decision was arbitrary and capricious because "the Secretary ignore[d] the agency's prior determinations concerning a road's environmental impact on Izembek without providing any reasoned explanation for this change." *Id.* at 1143. The Secretary did not appeal.

In 2019, King Cove Corporation asked Secretary David Bernhardt to reconsider a land exchange, and the Secretary approved an agreement similar to the vacated 2018 agreement. He found that the exchange "comports with the purposes of . . . ANILCA because it strikes the proper balance between protection of scenic, natural, cultural, and environmental values and provides opportunities for the long-term social and physical well-being of the Alaska Native people." He also stated that "to the extent an authorization under ANILCA constitutes a policy change from that described by Secretary Jewell in the 2013 [decision] rejecting a similar, but not identical, land exchange . . . , such change is warranted, necessary, and appropriate." The Secretary cited "[t]he acute necessity, underestimated in the 2013 [decision], for a road connecting King Cove and Cold Bay to serve the future emergency medical and other social needs of the Alaska Native

residents of King Cove and the Alaskan people." He also pointed to "[c]hanged information concerning the viability and availability of alternative means of transportation that have since proven to be neither viable nor available."

Secretary Bernhardt found that the feasibility of a marine transportation link—a "key" alternative mode of transportation considered in the 2013 decision—was "highly speculative at the time" and that "[d]ecades of experience have established that . . . theoretical [transportation] alternatives have been consistently found by the King Cove Native people to be infeasible or inadequate to provide for their health and safety." He explained that since 2013, "there have been over 70 medevacs from King Cove to hospital facilities in Cold Bay, Anchorage, or Seattle," and more than 20 "had to be handled by the U.S. Coast Guard at a cost of approximately $50,000 per rescue mission." The Secretary also stated that a 2015 study of transportation alternatives prepared by the Army Corps of Engineers had "assessed the viability of non-road alternatives" and revealed them to be "prohibitively costly and/or insufficiently dependable." He concluded that "even if the facts are as stated in the 2013 [decision]; that is, that a road is a viable alternative but (a) there are 'viable, and at times preferable' transportation alternatives for medical services and (b) resources would be degraded by the road's construction—human life and safety must be the paramount concern in this instance."

Plaintiffs again challenged the agreement. The State of Alaska, King Cove Corporation, the Agdaagux Tribe of King Cove, and the Native Village of Belkofski intervened in defense of the agreement.

The district court granted summary judgment to plaintiffs and vacated the agreement. The district court held that "the Exchange Agreement fails to advance the stated

purposes of ANILCA, [so] it is not permissible under that statute." It also held that "the Secretary's decision to enter into the Exchange Agreement is arbitrary and capricious . . . because the Secretary failed to provide adequate reasoning to support the change in policy in favor of a land exchange and a road through Izembek." Finally, it concluded that "the Exchange Agreement is . . . an approval of a transportation system that falls within the ambit of [ANILCA] Title XI," which establishes procedures for approving such systems, and that the Secretary failed to follow that law's procedural requirements. *See* 16 U.S.C. §§ 3161(c), 3164(a). Plaintiffs had also asserted claims under the National Environmental Policy Act of 1969, 42 U.S.C. § 4321 *et seq.*, and the Endangered Species Act of 1973, 16 U.S.C. § 1531 *et seq.*, but the district court declined to reach those claims.

## II

We begin by considering whether Secretary Bernhardt correctly understood ANILCA's purposes when he decided that a land exchange was appropriate under that statute. The Secretary stated that he placed great weight on the interests of "[t]he Alaska Native Aleut people [who] have lived at the King Cove village site for thousands of years before ANILCA designated their backyard Wilderness." He reasoned that the exchange would promote ANILCA's purposes by "providing an adequate opportunity for satisfaction of the economic and social needs of the Alaska Native people of King Cove." The district court, however, concluded that ANILCA's purposes do not include "further[ing] the economic and social needs of Alaska and its people," so it held that the Secretary acted improperly in relying on those factors.

ANILCA authorizes the Secretary, "in acquiring lands for the purposes of this Act, . . . to exchange lands (including lands within conservation system units and within the National Forest System)" with Alaska Native village corporations. 16 U.S.C. § 3192(h)(1). The government argues that because the statute refers to "acquiring lands," it requires only that the lands acquired in an exchange will further "the purposes of this Act," and it does not require considering the lands that are given up. We need not resolve that issue because even considering the transaction as a whole, we think the Secretary's analysis of the statutory purposes was correct.

The district court construed ANILCA to be focused narrowly on "preservation and subsistence." The text of the statute reveals otherwise. The statute identifies its purposes in a section entitled "Congressional statement of purpose." 16 U.S.C. § 3101. One of the enumerated purposes is to protect environmental resources, *id.* § 3101(a), (b), and another is "to provide the opportunity for rural residents engaged in a subsistence way of life to continue to do so," *id.* § 3101(c). But other purposes are set out in section 3101(d), which states that ANILCA "provides sufficient protection for the national interest in the scenic, natural, cultural and environmental values on the public lands in Alaska, and at the same time provides adequate opportunity for satisfaction of the economic and social needs of the State of Alaska and its people"—the purposes the Secretary invoked here. *Id.* § 3101(d).

According to the district court, section 3101(d) does not mean "that one of the purposes of ANILCA is to further the economic and social needs of Alaska and its people." Instead, the court read that provision as "an acknowledgement that, in passing ANILCA, Congress has achieved the proper balance between conservation needs and

economic and social needs." But to say that Congress struck a "balance" between two sets of objectives is to say that, to the extent possible, it sought to achieve both of them. The Secretary's land-exchange authority is one way Congress did that: Providing the Secretary with authority to exchange lands obviates the need for continued congressional intervention to maintain the balance struck in ANILCA. It therefore would make little sense to say that the Secretary may not use that authority to satisfy the economic and social needs of Alaskans. To the contrary, by using the word "adequate," Congress gave the Secretary discretion to strike an appropriate balance between environmental interests and "economic and social needs." 16 U.S.C. § 3101(d). Secretary Bernhardt exercised that discretion when he found that, without a road, the economic and social needs of the people of King Cove would not be adequately met.

The district court's reading of ANILCA is contrary to the Supreme Court's decision in *Sturgeon v. Frost*, 139 S. Ct. 1066 (2019). In that case, the Court explained that ANILCA reflects a "grand bargain," *id.* at 1083, in which Congress "sought to 'balance' two goals, often thought conflicting": to protect "'scenic, natural, cultural and environmental values'" and to "'provide[] adequate opportunity for satisfaction of the economic and social needs of the State of Alaska and its people,'" *id.* at 1075 (alteration in original) (quoting 16 U.S.C. § 3101(d)). In other words, the Court said, Congress had "twofold ambitions." *Id.* Those are the ambitions that spurred the Secretary to act here. Balancing them necessarily required the Secretary to make tradeoffs, giving greater weight to some considerations and less weight to others.

The district court relied on our decision in *Alaska v. Federal Subsistence Board*, 544 F.3d 1089 (9th Cir. 2008),

in which we said that ANILCA has the purposes of "protecting and preserving the subsistence lifestyle and protecting and preserving wildlife," *id.* at 1098. But we did not say that those were the statute's *only* purposes— economic and social needs were not at issue in the case— and we have previously described the "dual purpose" of ANILCA more broadly: "ANILCA was passed to furnish guidelines for the protection for the national interest in the scenic, natural, cultural and environmental values of the public lands in Alaska *and* to provide an adequate opportunity for satisfaction of the economic and social needs of the people of Alaska." *City of Angoon v. Marsh*, 749 F.2d 1413, 1415–16 (9th Cir. 1984) (emphasis added).

One of the purposes of ANILCA, therefore, is to address the economic and social needs of Alaskans. The Secretary appropriately weighed those needs against the other statutory purposes in deciding whether to enter the land-exchange agreement.

## III

The district court also concluded that Secretary Bernhardt violated the Administrative Procedure Act by departing from his predecessor's position on the land exchange without adequate explanation. We disagree.

The APA requires a court to set aside agency action that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). For an agency's decision to survive review, "the agency must examine the relevant data and articulate a satisfactory explanation for its action including a 'rational connection between the facts found and the choice made.'" *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983) (quoting *Burlington Truck*

*Lines v. United States*, 371 U.S. 156, 168 (1962)). A "satisfactory explanation" need not be a perfect explanation. After studying an agency's decision, a reviewing court will usually be able to identify ways in which the agency might have been more precise or more thorough. But as long as the agency has considered the relevant factors, a court should not set aside the decision simply because it believes it could have written a better one. To the contrary, the Supreme Court has made clear that "a court is not to substitute its judgment for that of the agency" and must "'uphold a decision of less than ideal clarity if the agency's path may reasonably be discerned.'" *Id.* (quoting *Bowman Transp. Inc. v. Arkansas-Best Freight Sys.*, 419 U.S. 281, 286 (1974)).

Secretary Bernhardt's decision satisfies those standards. Secretary Bernhardt acknowledged the competing policy considerations, approvingly quoting Secretary Jewell's description of the decision as requiring weighing "on the one hand the concern for more reliable methods of medical transport from King Cove to Cold Bay and, on the other hand, a globally significant landscape that supports an abundance and diversity of wildlife unique to the Refuge." He acknowledged the prior findings that "keeping the isthmus roadless" would "best protect[] the habitat and wildlife of the Izembek Refuge" and that building a road "would be likely to have negative effects" on the many species for which the refuge is an important habitat. But after examining the most recent available information about alternatives to a road, Secretary Bernhardt concluded that the value of a road to the King Cove community outweighed the harm that it would cause to environmental interests: "I choose to place greater weight on the welfare and well-being of the Alaska Native people who call King Cove home."

Had the Secretary been writing on a blank slate, there seems to be no dispute that his explanation of his decision would be adequate to survive review. But the district court concluded that the Secretary "failed to provide adequate reasoning to support the change in policy" from Secretary Jewell's contrary decision in 2013. That conclusion reflects a misunderstanding of how courts review an agency's change in policy.

Before the Supreme Court's decision in *FCC v. Fox Television Stations, Inc.*, 556 U.S. 502 (2009), some courts had suggested that the APA requires agencies to provide a special explanation whenever they change policy. *See, e.g.*, *New York Council, Ass'n of Civilian Technicians v. FLRA*, 757 F.2d 502, 508 (2d Cir. 1985). But in *Fox*, the Court held that the APA "makes no distinction . . . between initial agency action and subsequent agency action undoing or revising that action." 556 U.S. at 515. It is therefore not true that "every agency action representing a policy change must be justified by reasons more substantial than those required to adopt a policy in the first instance." *Id.* at 514. While the agency must "display awareness that it is changing position" and must "show that there are good reasons for the new policy," "it need not demonstrate to a court's satisfaction that the reasons for the new policy are better than the reasons for the old one." *Id.* at 515 (emphases omitted).

Sometimes, Congress may restrict an agency's authority to alter policies once they are in place. *See, e.g.*, 42 U.S.C. § 6295(o)(1) (authorizing the Secretary of Energy to make certain energy-efficiency standards more rigorous but forbidding her to make them more lenient). But when it does not do so, then an agency is free to change its approach—the APA does not require "regulatory agencies [to] establish rules of conduct to last forever." *State Farm*, 463 U.S. at 42 (quoting *American Trucking Ass'ns v. Atchison, Topeka, &*

*Santa Fe Ry. Co.*, 387 U.S. 397, 416 (1967)). An agency may alter course either because of a change in circumstances or because of a shift in its policy priorities, perhaps due to a change in presidential administrations, such as the one that occurred between the tenure of Secretary Jewell and that of Secretary Zinke—or the one that occurred during the pendency of this appeal, when Secretary Bernhardt was succeeded by Secretary Debra Haaland. (The government informs us that Secretary Haaland is currently conducting a "review of this matter.") We have held that an agency may reprioritize some concerns over others it previously deemed more important, "even on precisely the same record." *Organized Vill. of Kake v. USDA*, 795 F.3d 956, 968 (9th Cir. 2015) (en banc); *see State Farm*, 463 U.S. at 57 ("An agency's view of what is in the public interest may change, either with or without a change in circumstances." (quoting *Greater Boston Television Corp. v. FCC*, 444 F.2d 841, 852 (D.C. Cir. 1970))); *accord National Ass'n of Home Builders v. EPA*, 682 F.3d 1032, 1038 (D.C. Cir. 2012).

To be sure, when an agency's "new policy rests upon factual findings that contradict those which underlay its prior policy," then the agency may need to provide a more detailed explanation for changing course. *Fox*, 556 U.S. at 515. But in that situation, it is not "the mere fact of policy change" that demands explanation, but instead "that a reasoned explanation is needed for disregarding facts and circumstances that underlay . . . the prior policy." *Id.* at 515–16; *accord Organized Vill. of Kake*, 795 F.3d at 968.

Here, the decision whether to approve the land exchange required balancing two competing objectives, with the outcome depending on which one was given greater weight. Secretary Bernhardt stated: "While I appreciate that Secretary Jewell placed greater weight on protecting 'the

unique resources the Department administers for the entire Nation,' I choose to place greater weight on the welfare and well-being of the Alaska Native people who call King Cove home." The choice to place greater weight on the interests of King Cove residents sufficiently explained the change in policy. And the Secretary was entitled in 2019 "to give more weight to socioeconomic concerns" than his predecessor had in 2013, "even on precisely the same record." *Organized Vill. of Kake*, 795 F.3d at 968.

It is true that Secretary Bernhardt also found that some facts had changed since 2013. But he made clear that his decision did not depend on those findings. Specifically, he stated that he would reach the same decision "even assuming all the facts as stated" by Secretary Jewell. Secretary Bernhardt elaborated that if the facts were the same as in 2013, "that is, that a road is a viable alternative but (a) there are 'viable, and at times preferable' transportation alternatives for medical services and (b) resources would be degraded by the road's construction—human life and safety must be the paramount concern." Thus, the Secretary "did not rely on new facts, but rather on a reevaluation of which policy would be better in light of the facts." *National Ass'n of Home Builders*, 682 F.3d at 1038; *see Fox*, 556 U.S. at 514–16. His explanation of that reevaluation was sufficient to satisfy the APA.

For that reason, the district court's criticisms of the Secretary's factual findings are beside the point. It is true that a court must evaluate an agency's action on the basis of the explanation the agency gave at the time. *SEC v. Chenery Corp.*, 318 U.S. 80, 87 (1943). But an agency may offer alternative rationales for its decision, and if the agency makes clear that one would have been independently sufficient to justify its action, then a court need not consider the others if it finds the first to be valid. *See National Fuel*

*Gas Supply Corp. v. FERC*, 468 F.3d 831, 839 (D.C. Cir. 2006); *United States v. Ross*, 848 F.3d 1129, 1135 (D.C. Cir. 2017). Plaintiffs do not dispute that both components of Secretary Bernhardt's decision—his new factual findings and his determination that changed policy priorities would lead him to the same result even without the new factual findings—were "genuine justifications" for his action. *See Department of Com. v. New York*, 139 S. Ct. 2551, 2575–76 (2019). The justifications were clearly stated in the decision; they "can be scrutinized by courts and the interested public"; and they allow the public to know where to assign credit or blame for the decision. *Id.*; *see also Department of Homeland Sec. v. Regents of the Univ. of Cal.*, 140 S. Ct. 1891, 1907–10 (2020); *East Bay Sanctuary Covenant v. Garland*, 994 F.3d 962, 990–91 (9th Cir. 2020) (Miller, J., concurring in part and dissenting in part). There is therefore no reason to look beyond the valid justification that Secretary Bernhardt offered.

In any event, even if we considered it necessary to review Secretary Bernhardt's assessment of the facts, we would not agree with the district court that Secretary Bernhardt arbitrarily contradicted Secretary Jewell's factual findings. First, the district court concluded that Secretary Bernhardt contradicted prior agency findings by determining "that the environmental harms to Izembek can be adequately mitigated through restrictions and added acreage." That is not what Secretary Bernhardt said. Secretary Jewell had found that the adverse effects of road use would not be mitigated by regulation or roadside barriers and that the lands offered in exchange by King Cove would not "compensate for the adverse effects of . . . constructing a road." But as the district court acknowledged, Secretary Bernhardt did not challenge those findings. Instead, he made the uncontroversial observations that adding acreage to

federal ownership promotes environmental values, and that the uses to which a single-lane gravel road can be put are inherently limited. He then proceeded to rebalance the "environmental values" of the exchange against "the economic and social needs of the Alaska Native people of King Cove." He did not determine that the land-acquisition and road-use limitations would completely offset any environmental harm—only that the exchange "strikes the proper balance." That conclusion did not disturb any underlying finding of fact.

Second, the district court observed that Secretary Bernhardt's "finding that there are no reasonable transportation alternatives to meet the urgent needs of King Cove residents" contradicts Secretary Jewell's earlier finding that a hovercraft, a landing craft, or a ferry were all viable options. That is indeed a difference in the assessment of the facts, but it is one that Secretary Bernhardt explained. He acknowledged the "theoretical alternatives" but concluded that "[d]ecades of experience have established that [they] have been consistently found by the King Cove Native people to be infeasible or inadequate to provide for their health and safety." Specifically, he cited a 2015 report prepared by the Army Corps of Engineers that identified the costs and risks of alternatives to a road and, as he put it, "indicate[d] that alternative transportation routes have . . . proven to be prohibitively costly and/or insufficiently dependable." Indeed, despite years of study and a now-defunct hovercraft program, none of the alternatives considered by Secretary Jewell has developed into a reliable means of transportation. That has resulted in what Secretary Bernhardt described as an "unsatisfactory status quo," and it supports his findings about the availability and practical viability of the alternatives.

## IV

Finally, we consider whether the land-exchange agreement is subject to the special procedures that ANILCA requires for the approval of transportation systems. Title XI of ANILCA sets out "a single comprehensive statutory authority for the approval or disapproval of applications for [transportation and utility] systems," including roads, within conservation units or areas in Alaska. 16 U.S.C. § 3161(c); *see id.* § 3162(4) (defining "transportation or utility system"). It provides that "no action by any Federal agency under applicable law with respect to the approval or disapproval of the authorization, in whole or in part, of any transportation or utility system shall have any force or effect unless the provisions of this section are complied with." *Id.* § 3164(a). Those provisions, in turn, require the agency approving the system to engage in a process of public consultation and to make "detailed findings supported by substantial evidence" on various issues. *Id.* § 3164(g).

The Secretary did not follow that process, but the government argues that he did not have to do so because section 3192(h), the land-exchange provision that he invoked, is not an "applicable law" for purposes of Title XI. We agree. We therefore need not consider the alternative argument advanced by the State that the land exchange is exempted from Title XI by 16 U.S.C. § 3170(b), which guarantees a right of access to inholdings of state and native land within conservation system units.

Title XI defines an "applicable law" as "any law of general applicability . . . under which any Federal department or agency has jurisdiction to grant any authorization (including but not limited to, any right-of-way, permit, license, lease, or certificate) without which a transportation or utility system cannot, in whole or in part,

be established or operated." 16 U.S.C. § 3162(1). Section 3192(h) is not such a law because it authorizes the Secretary only "to exchange lands." *Id.* § 3192(h)(1). It does not give him "jurisdiction to grant any authorization" necessary for a "transportation or utility system." *Id.* § 3162(1). To be sure, once lands are transferred, the recipient might use them to build a road. That, of course, is the purpose of the transfer at issue here. But under Title XI, a "transportation or utility system" includes only systems for which a "portion of the route of the system will be within any conservation system unit, national recreation area, or national conservation area." *Id.* § 3162(4)(A). Land transferred out of a conservation system unit in a land exchange is, by definition, no longer "within any conservation system unit." *Id.*; *see also id.* § 3103(c) ("No lands which . . . are conveyed to the State, to any Native Corporation, or to any private party shall be subject to the regulations applicable solely to public lands within such units."); *Sturgeon*, 139 S. Ct. at 1078 (noting that ANILCA defines "public land" as "(almost all) 'lands, waters, and interests therein' the 'title to which is in the United States'" (quoting 16 U.S.C. § 3102(1)–(3))). Nor is any road later built on such land.

Construing section 3192(h) to be an "applicable law" would make little sense because it would mean that essentially all land exchanges would be subject to Title XI. The statute defines "transportation or utility system" to include roads, airfields, ditches, pipelines, radio antennas, telephone systems, and electrical transmission and distribution systems. 16 U.S.C. § 3162(4)(B). Given the breadth of that definition, any entity receiving land in an exchange is likely to wish to install some type of "transportation or utility system" upon it. Plaintiffs attempt to resist that conclusion by arguing that Title XI applies only when the Secretary enters into a land exchange for the

purpose of enabling the construction of a transportation or utility system. But nothing in the statute suggests that the Secretary's subjective intent is relevant. All that matters is whether section 3192(h) authorizes construction of a road within a conservation system unit, and it does not.

Even if section 3192(h) could authorize roads in some cases, the land-exchange agreement at issue here does not authorize a road, whether "in whole or in part." 16 U.S.C. § 3164(a). Secretary Bernhardt explained that although the "land exchange agreement envisions that [King Cove Corporation] may construct a road, it is not an 'authorization' to do so." Such authorization will require King Cove Corporation to obtain permits under the Clean Water Act and other governing laws. *See, e.g.*, 33 U.S.C. § 1344. The agreement recognizes that reality by providing specifications for "[t]he road, *if any*, constructed on the land" (emphasis added). Because the agreement was not executed under an "applicable law" and does not purport to authorize a "transportation system," it is not subject to Title XI's requirements.

**REVERSED and REMANDED.**

---

WARDLAW, Circuit Judge, dissenting:

I respectfully dissent. The district court properly concluded that Secretary Bernhardt's decision to accede to King Cove's wish to build a road through Izembek National Wildlife Refuge, despite DOI's "long history of considering the impacts of a road through Izembek and ruling against the road based on the detrimental effects it would have on

Izembek's ecological resources,"[1] violates both the Administrative Procedure Act (APA) and the Alaska National Interest Lands Conservation Act (ANILCA). Of course, a change in presidential administrations may result in a policy shift, Maj. Op. 19, but that observation does not resolve the questions this particular tectonic shift raises.

As recently as 2013, DOI Secretary Jewell published a twenty-page record of decision (2013 ROD) following a lengthy public process, including preparation of a Draft Environmental Impact Statement (EIS), receipt of public comments, preparation of a Final EIS, and numerous public meetings and sessions in Alaska between senior DOI officials, officials from the Bureau of Indian Affairs, and King Cove Residents. The Final EIS demonstrated that "construction of a road through the Izembek National Wildlife Refuge would lead to significant degradation of irreplaceable ecological resources that would not be offset by the protection of other lands to be received under an exchange." Secretary Jewell decided against the land exchange then authorized by Congress[2] because "reasonable and viable transportation alternatives exist to meet the important health and safety needs of the people of King Cove."

In the aftermath of the 2016 presidential election, the new DOI Secretary, Secretary Zinke, made a public

---

[1] This long history is detailed in the district court's opinion vacating the 2018 Exchange Agreement. *See Friends of Alaska Nat'l Wildlife Refuges v. Bernhardt*, 381 F. Supp. 3d 1127, 1130–33 (D. Alaska 2019).

[2] In 2009, Congress tasked DOI with this review of the propriety of a land exchange for the purpose of constructing a road through Izembek. Omnibus Public Land Management Act of 2009, Pub. L. No. 111-11, 123 Stat. 991, 1178–83 (2009) (OPLMA).

commitment to work on a land exchange with King Cove Corporation (KCC) to facilitate the construction of the road. When asked by Chairman Murkowski about the land exchange at his January 17, 2017, confirmation hearing, Secretary Zinke stated, "You have my absolute commitment that I will restore trust and work with you on [the land exchange] because it is important."[3]  Shortly thereafter, on January 22, 2018, Secretary Zinke entered into the 2018 Exchange Agreement, which dictated that the road would be used "primarily for health, safety, and quality of life purposes (including access to and from the Cold Bay Airport) and generally for non-commercial purposes." Plaintiffs challenged the 2018 Exchange Agreement, and the district court vacated it as an unlawful agency action.  The district court found that it "failed to acknowledge the change in DOI policy, provided no reasoned explanation for changing course on DOI's prior determinations, and ignored its prior determinations about the road's environmental impacts on Izembek." *Friends of Alaska Nat'l Wildlife Refuge v. Bernhardt*, 463 F. Supp. 3d 1011, 1017 (D. Alaska 2020).  Indeed, the 2018 Exchange Agreement failed to address or acknowledge the 2013 ROD and its findings. *See Friends of Alaska*, 381 F. Supp. 3d at 1140.

Thereafter, Secretary Bernhardt entered into the 2019 Exchange Agreement now before us, and set forth his reasons in an accompanying memorandum that did address the 2013 ROD.  However, this version of the agreement does not limit use of the road to health and safety purposes, nor does it prohibit commercial uses.

---

[3] Nomination Hearing of the Honorable Ryan Zinke To Be the Secretary of the Interior: Hearing Before the S. Comm. on Energy and Natural Resources, 115th Cong. 115–16 (2017).

And here is where I part company with my colleagues in the majority.  Secretary Bernhardt's memorandum contradicts key findings of the 2013 ROD.  Moreover, the DOI purports to have the authority to enter the 2019 Exchange Agreement under ANILCA, 16 U.S.C. § 3192(h), when in fact the Exchange Agreement fails to advance ANILCA's stated purposes, and DOI failed to follow the procedural requirements set forth in Title XI of ANILCA.

## I.

Secretary Bernhardt failed to adequately justify DOI's change of policy under the APA.  While an agency is permitted to rebalance the facts before it to reach an alternate policy decision, if its new policy "rests upon factual findings that contradict those which underlay its prior policy," *FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 515 (2009), the agency must provide a "more substantial justification," *Org. Vill. of Kake v. USDA*, 795 F.3d 956, 967 (9th Cir. 2015) (en banc) (quoting *Perez v. Mortg. Bankers Ass'n*, 575 U.S. 92, 106 (2015)).  Specifically, "a reasoned explanation is needed for disregarding facts and circumstances that underlay or were engendered by the prior policy."  *Fox*, 556 U.S. at 516.  At multiple points, Secretary Bernhardt relied upon contradictory facts while changing the agency's land exchange policy, yet he failed to provide sufficiently detailed justifications.  Thus, the APA requires that we set aside the 2019 Exchange Agreement for this reason alone.  5 U.S.C. § 706(2).

## A.

First, Secretary Bernhardt found that the environmental harms inflicted by the road's construction could be adequately mitigated through use restrictions on the road and the substantial benefits of the land exchange's proposed

additional acreage.  This directly contradicts Secretary Jewell's factual findings.

In the 2013 ROD, Secretary Jewell rejected the argument that limiting the proposed road's use to "health and safety purposes" that were "noncommercial" would sufficiently protect the Izembek's ecological virtues.  Notwithstanding these use restrictions, Secretary Jewell found that the road's destructive impact would "radiate far beyond the footprint of the road corridor," because the process of constructing and maintaining the road would create a "high potential for increased off-road access."  Thus, Secretary Bernhardt's finding that use restrictions would adequately limit the road's disruption of the Izembek Wilderness directly contradicts the agency's prior factual finding.

The same is true of Secretary Bernhardt's finding that the land exchange is justified because it would add acreage to Alaska's protected lands.  Although the majority is correct that Secretary Bernhardt cast his decision as reweighing the exchange's "environmental values" against the Alaskan Native people's economic and social needs, he also stated that the land exchange would "enhance[] the purposes of the Refuge" and benefit Alaskan residents by protecting the "scenic, natural, cultural, and environmental values."  But Secretary Jewell rejected the land exchange precisely because there would be "significant degradation of irreplaceable ecological resources that would not be offset by the protection of other lands," finding the additional acreage non-beneficial because it would "not provide the [same] wildlife diversity," nor prevent the road from "irreparably and significantly impair[ing] this spectacular Wilderness refuge."  Thus, by basing his decision, at least in part, on a finding that the land exchange would enhance the Refuge and protect environmental values, Secretary

Bernhardt "disregard[ed] facts and circumstances that underlay" Secretary Jewell's decision. *Fox*, 556 U.S. at 516. Nor did Secretary Bernhardt provide any information or data to justify this change in factual finding.

Second, Secretary Bernhardt found that there were not sufficiently viable non-road transportation alternatives to the proposed road, directly contradicting Secretary Jewell's finding that hovercraft, landing craft, and ferry were all viable alternatives. Secretary Bernhardt based this finding on a 2015 U.S. Army Corps of Engineers study that evaluated the costs of transportation alternatives and the urgent need for a road. The district court correctly concluded that the 2015 study does not provide the necessary justification for the Secretary's conclusion.

Secretary Bernhardt cited to the 2015 study for the proposition that "theoretical alternatives have been consistently found by the King Cove Native people to be infeasible or inadequate to provide for their health and safety." But he places more weight on the 2015 study than it can bear. As the district court correctly found, this 2015 study merely provided information about the estimated costs of non-road alternatives. Secretary Bernhardt claims that the study "indicates that alternative transportation routes have been subsequently considered and proven to be prohibitively costly and/or insufficiently dependable," yet he fails to explain why the costs are prohibitive or the dependability inadequate. While empirical data is certainly a start, Secretary Bernhardt is required to provide a reasonable explanation as to how the data supports his change in policy position. He fails to do so.

This lack of explanation is especially troubling here, given that some of the 2015 study's data equally supports Secretary Jewell's finding that there are viable non-road

alternatives. For instance, the 2015 study estimated that one of the marine alternative's 75-year life cycle cost amounts to $56.7 million. That amount is *less* than the estimated life-cycle cost of the road: around $61 million for 75 years of operation.[4] As another example, the study states that a marine link would be dependable more than 99% of the year, while the 2013 ROD estimated that a road would be dependable for around 98% of the year. Although these comparable figures suggest that transportation alternatives are just as viable as a road, Secretary Bernhardt's memorandum does not explain why he concludes otherwise.

As to the claim that a road is urgently needed, the district court correctly found that Secretary Bernhardt failed to explain why the need for a road is more urgent now than Secretary Jewell understood it to be in 2013. Secretary Bernhardt relied heavily on a 2019 letter from KCC requesting that the agency reconsider the road due to the number of medical evacuations since 2014, a crash at King Cove airport, and a medical emergency. He also cited to testimony about the costs of Coast Guard medical evacuations in King Cove to bolster his finding that the need for a road is so urgent that transportation alternatives are infeasible. However, none of this information involves new issues of urgency that were not already understood and analyzed by Secretary Jewell. Like Secretary Bernhardt, Secretary Jewell listened to King Cove's residents' reasons for requesting a road, considered the potential dangers of

---

[4] According to the 2013 ROD, the 35-year life cycle cost for the road construction is an estimated $34.2 million. Given that the approximate yearly maintenance cost is an estimated $670,000, one would multiply $670,000 by 40 to determine the road's cost from year 35 to year 75: $26.8 million. By adding $34.2 million (cost of the road's first 35 years) and $26.8 million (cost of the road's following 40 years), one arrives at $61 million for the 75-year span.

emergency evacuations, and understood that the Coast Guard would need to provide medevacs, but nonetheless concluded that non-road transportation alternatives were viable.  Secretary Bernhardt failed to provide a reasoned analysis of how this information justifies his finding that transportation alternatives must now be discarded in favor of a road.

Finally, Secretary Bernhardt asserts that his about-face on the land exchange is justified because the 2013 ROD failed to consider the impact of a marine-based transportation route on the "Southwest Alaska Distinct Population Segment of Northern Sea Otters."  But without further reasoning, analysis, or fact-finding, Secretary Bernhardt has failed to explain why this single factor turns the tide against marine-based transportation routes.  And, as the district court pointed out, the "prior EIS considered such impacts when assessing the various alternatives."  Secretary Bernhardt again fails to provide a reasoned explanation for his contrary findings.  Because "unexplained conflicting findings about the environmental impacts of a proposed agency action violate the APA," the land exchange cannot stand.  *Kake*, 795 F.3d at 969.

## B.

These contradictory factual findings are "beside the point" according to the majority, Maj. Op. 20–21, because Secretary Bernhardt said what apparently have become the magic words for surviving APA review of a change in agency policy: "even assuming all the facts as stated in the 2013 ROD, in the exercise of policy discretion," he finds the Exchange Agreement consistent with the public interest, a finding directly contrary to Secretary Jewell's 2013 decision. But that lets Secretary Bernhardt off far too easily. Certainly, agencies may reach different conclusions "even

on precisely the same record," but Secretary Bernhardt "did not simply rebalance old facts to arrive at the new policy." *Kake*, 795 F.3d at 968. As discussed above, the Secretary's 2019 memorandum relies upon new factual findings regarding the land exchange's environmental impact and the viability of transportation alternatives, with merely a tip of the hat toward any reweighing of the same facts. The panel should judge the Secretary's 2019 decision "by the grounds invoked by the agency." *SEC v. Chenery Corp.*, 332 U.S. 194, 196 (1947).

To determine that the Secretary relied on new factual findings rather than on reweighing the same facts in the 2013 ROD, one need only observe the lack of analysis in the Secretary's purported "reweighing." After purportedly assuming the same facts, the Secretary did not engage in any real analysis of how the facts as they were in 2013 prompted the decision he reached, exactly what led him to reweigh them, or the specific factors he was reweighing, aside from his pronouncement that "human life and safety must be the paramount concern." Such a dearth of analysis indicates one of two fatal flaws under the APA. Either the agency did not "consider[] the relevant factors and articulate[] a rational connection between the facts found and the choices made," *Ctr. for Biological Diversity v. Haaland*, 998 F.3d 1061, 1067 (9th Cir. 2021) (quoting *Alaska Oil & Gas Ass'n v. Pritzker*, 840 F.3d 671, 675 (9th Cir. 2016)), or the agency simply "disregard[ed] facts and circumstances that underlay or were engendered by the prior policy," *Fox*, 556 U.S. at 516.

The majority's position allows agencies to evade *Fox*'s explanation requirement so easily that it actually eliminates it, as here. Secretary Bernhardt simply elided *Fox*'s requirement by "assuming all the facts as stated in the 2013

ROD," then reaching a contrary conclusion.  Moreover, it is difficult to reconcile that statement when in fact his memorandum "rests upon factual findings that contradict those which underlay" the 2013 ROD.  *Id.* at 515.  While agencies must be permitted to advance alternative justifications for policy changes, *see* Maj. Op. 21, they should be actual alternative justifications, not merely a sleight of hand to avoid putting forward reasons adequate to justify contradictory conclusions.

## II.

Moreover, the Secretary lacked statutory authority to enter into the Exchange Agreement.  It was not authorized under ANILCA because it fails to further ANILCA's stated purposes.  ANILCA authorizes the Secretary to enter land exchanges that further "the purposes of this Act."  *See* 16 U.S.C. § 3192(a), (h).  Section 3192(h) specifically authorizes land exchanges to acquire lands for the purposes of ANILCA.

The Secretary expressly states that he is not proceeding under the Omnibus Public Land Management Act of 2009 (OPLMA), but is proceeding only under ANILCA—so the land exchange agreement is valid only if it serves the two purposes of the statute.  ANILCA emerged from President Carter's early commitment to set the conservation of Alaska's rich natural resources as a top priority for our nation.  He exhorted the 95th Congress to "conserve large unspoiled sections of the American wilderness in Alaska," stating that "[n]o conservation action [it] could take would have more lasting value than this."  *Message from the President of the United States*, H.R. Doc. No. 95-160 (1977).  Three years later, President Carter signed ANILCA into law on December 2, 1980, setting aside over 104 million acres of Alaskan land for protection.  *See* Alaska National Interest

Lands Conservation Act, Pub. L. No. 96-487, 94 Stat. 2371 (1980); *see also Sturgeon v. Frost*, 577 U.S. 424, 431 (2016). Moments before signing ANILCA into law, the President remarked, "With this bill we are acknowledging that Alaska's wilderness areas are truly this country's crown jewels and that Alaska's resources are treasures of another sort." *Remarks on Signing H.R. 39 into Law*, 3 Pub. Papers 2756–57 (Dec. 2, 1980).

Congress enacted ANILCA to further two specific ends, which are enshrined in 16 U.S.C. §§ 3101(b), (c). *See Alaska v. Fed. Subsistence Bd.*, 544 F.3d 1089, 1091 (9th Cir. 2008). Congress enacted ANILCA, first, "to preserve unrivaled scenic and geological values associated with natural landscapes," including Alaska's unique ecosystems, wildlife, subsistence resources, natural features, recreational opportunities, and scientific research sites. *See* 16 U.S.C. § 3101(b). Congress's second intent and purpose in enacting ANILCA was "to provide the opportunity for rural residents engaged in a subsistence way of life to continue to do so." *Id.* § 3101(c). Congress could not have been any more clear in stating its two purposes in enacting this statute.

The Secretary claims authority to enter into the land exchange under section 3192(h), which permits land exchanges in order to "acquire lands for the purposes of [ANILCA]." *Id.* § 3192(h). However, the 2019 Exchange Agreement neither purports to nor furthers either the preservation or the subsistence purposes of the Act. *Id.* §§ 3101(b), (c). Decades of agency deliberations, memoranda, and litigation attest that a road through Izembek will irreversibly harm the area's unique natural resources—the Secretary's 2019 memorandum does not dispute this. As the 2013 ROD stated, the habitat uses on the Izembek isthmus would be "irreversibly and irretrievably changed by

the presence of a road." This "narrow isthmus (~3 miles wide) of rolling tundra surrounded by sheltered wetlands, lagoons, and shallow bays . . . contains important, unique and undisturbed habitats, including the world's largest eelgrass beds." Due to the Izembek Refuge's unique placement and combination of habitats, it is "a critical area for wildlife, especially migratory birds, some of which use the area exclusively during certain stages of their life history, as they rest and feed in preparation for long migrations." Furthermore, the Refuge is vital to the world's only population of non-migratory Tundra Swans, as this population relies on the area to overwinter. The 2013 ROD found that the bird species, like the Tundra Swans, that overwinter there would be "particularly vulnerable" to the impacts of road construction and operation. The road would also disrupt a key area in which brown bear mothers regularly give birth, as well as fracture a uniquely undisturbed habitat for grizzly bears, caribou, and wolves. This is just a fragment of the multitude of losses that would accompany the construction of a road straight through nearly 300,000 acres of Alaskan wilderness.

As to ANILCA's second, subsistence purpose, the agency attempted to fit the 2019 Exchange Agreement into ANILCA's subsistence purpose only after the commencement of this lawsuit—neither the 2019 Exchange Agreement nor Secretary Bernhardt's accompanying memorandum justifies the Agreement under ANILCA's subsistence purpose. However, we may review an agency's action according to its "contemporaneous explanations" only, as we are prohibited from considering the agency's "*post hoc* justifications." *DHS v. Regents of the Univ. of Cal.*, 140 S. Ct. 1891, 1909 (2020); *see also SEC v. Chenery Corp.*, 318 U.S. 80, 94 (1943). We are thus prohibited from

considering the agency's new-found subsistence purpose arguments.

Because it is obvious that the land exchange runs counter to ANILCA's stated purposes, DOI reads into the statute a third Congressional "purpose" for enacting ANILCA.  In the 2019 Memorandum, the Secretary states that the land exchange

> serves the purposes of ANILCA by striking the proper and appropriate balance between protecting the national interest in the scenic, natural, cultural, and environmental values of the public lands in Alaska and providing an adequate opportunity for satisfaction of the economic and social needs of the Alaska Native people of King Cove.

This statement invokes the language of 16 U.S.C. § 3101(d) addressing the "economic and social needs" of the Alaskan population, but it lifts it entirely out of context. Subsection 3101(d) does not articulate ANILCA's purposes, but instead clarifies that further legislation is unnecessary because Congress *has already struck* the balance between preserving Alaska's unique resources and satisfying the needs of Alaska's people.

Comparing the plain language of subsection 3101(d) with subsections 3101(b) and 3101(c), it is evident that subsection 3101(d) does not enumerate a third purpose for enacting ANILCA.  In subsection 3101(b), Congress expressly states, "It is the intent of Congress in this Act to preserve unrivaled scenic and geological values associated with natural landscapes . . . ."  The language of subsection 3101(c) mirrors that of subsection 3101(b).  There, Congress expressly states that "[i]t is further the intent and purpose of

this Act . . . to provide the opportunity for rural residents engaged in a subsistence way of life to continue to do so." In these provisions, Congress used the words "intent" and "purpose" to make clear that preservation and subsistence were the twin purposes of Alaska's Conservation Act.

Notably, Congress struck a different tone in subsection 3101(d), suggesting it intended that subsection to have a function distinct from that of subsections (b) and (c). Subsection 3101(d) reads:

> This Act provides sufficient protection for the national interest in the scenic, natural, cultural and environmental values on the public lands in Alaska, and at the same time provides adequate opportunity for satisfaction of the economic and social needs of the State of Alaska and its people; accordingly, the designation and disposition of the public lands in Alaska pursuant to this Act are found to represent a proper balance between the reservation of national conservation system units and those public lands necessary and appropriate for more intensive use and disposition, and thus Congress believes that the need for future legislation designating new conservation system units, new national conservation areas, or new national recreation areas, has been obviated thereby.

*Id.* § 3101(d). Unlike subsections (b) and (c), subsection 3101(d) does not purport to enumerate the "intent of Congress" or the "intent and purpose of this act." Instead, subsection (d) acknowledges what Congress has already done by enacting ANILCA: Congress struck the balance

between preserving Alaska's natural resources and providing for Alaska's economic and social needs, obviating the need for future legislation.  As the district court found, subsection 3101(d) does not state that Congress's purposes in establishing the conservation units under ANILCA was to further the economic and social needs of Alaska and its people.  This reading turns ANILCA on its head by taking what is essentially a conservation measure and turning it into an economic stimulus.

Adopting an "economic and social needs" rationale for agency action not only undermines ANILCA's two express purposes, it countermands the entire statutory scheme.  As nearly any environmentally destructive project could be billed as furthering economic and social needs, this putative statutory purpose would convert ANILCA from a constraint on over-using Alaska's natural resources to a rubber stamp for any land exchange that the current Secretary may desire. Environmentally protective legislation, such as ANILCA, is necessary precisely because it curbs the impulse toward over-use and extraction of our country's natural resources for the sake of otherwise worthy purposes.  Congress did not act with economic and social goals in enacting ANILCA, and it did not give carte blanche to the agency to depredate Alaska's irreplaceable natural wonders under the guise of pursuing the "economic and social needs" of Alaskans.

The majority's contrary interpretation of ANILCA's purposes rests on a misreading of the Supreme Court's opinion in *Sturgeon v. Frost*, 139 S. Ct. 1066 (2019).  Maj. Op. 15.  *Sturgeon* took us through Alaska's history from its acquisition from Russia to its statehood and resulting land grants to Alaskans and Alaskan Natives and finally the setting aside of extensive lands for national parks and preserves ultimately accomplished by Congress through

ANILCA.  *See Sturgeon*, 139 S. Ct. at 1073–78.  The specific dispute in *Sturgeon* is entirely unrelated to the land exchange provision we interpret here.[5]  *See id.* at 1073.  In passing, the Court describes "Congress's twofold ambitions" that it sought to accomplish in light of the history of conflicting claims to Alaska's vast natural resources and disputes over which land could be regulated by the National Park Service at all.   The Court took these overarching goals from subsection 3101(d):

> ANILCA sought to "balance" two goals, often thought conflicting.  16 U.S.C. § 3101(d).  The Act was designed to "provide[] sufficient protection for the national interest in the scenic, natural, cultural and environmental values on the public lands in Alaska."  *Ibid.*  "[A]nd at the same time," the Act was framed to "provide[] adequate opportunity for satisfaction of the economic and social needs of the State of Alaska and its people."  *Ibid.*  So if . . . you see some tension within the statute, you are not mistaken: It arises from Congress's twofold ambitions.

*Id.* at 1075.  To the extent the Court discussed ANILCA's purposes, it spoke to what Congress had already accomplished by enacting ANILCA.  The Court did not mention at all the statutory purposes expressly set forth in

---

**5** In *Sturgeon*, the Court addressed whether the portion of the Nation River that runs through the Yukon-Charley National Park qualifies as public land or non-public land under 16 U.S.C. § 3103(c).  *Sturgeon*, 139 S. Ct. at 1073.  The Court concluded that it was a non-public land for the purposes of ANILCA and thus was not subject to the Park Service's regulatory powers under ANILCA.  *Id.* at 1087.

subsections 3101(b) and 3101(c), which are the "purposes" to which section 3192(h) refers.  To authorize the Secretary to change the boundaries of the carefully defined conservation system units for the amorphous reason of satisfying economic and social needs would defeat the careful balance Congress struck.  Thus, to the extent *Sturgeon* has any bearing on this issue—which is vanishingly slight—it supports our understanding of subsection 3101(d).

Therefore, because the land exchange does not further either of ANILCA's two purposes, it cannot be authorized under ANILCA.  Given that the Secretary disavowed OPLMA as a source of authority, the ineluctable conclusion is that DOI entered into the 2019 Land Exchange without statutory authority to do so.

## III.

Even assuming ANILCA authorized the Exchange Agreement, it would be an approval of a transportation system governed by the procedures set forth in Title XI of ANILCA, and would fall because DOI failed to follow those procedures.  In ANILCA Title XI, Congress established "a single comprehensive statutory authority" for approving and disapproving transportation and utility systems through Alaska's conservation units and areas.  16 U.S.C. § 3161(c).  Title XI mandates that "no action by any Federal agency under applicable law with respect to the approval or disapproval of the authorization, in whole or in part, of any transportation or utility system shall have any force or effect" unless the agency complies with Title XI's requirements.  *Id.* § 3164(a).  Because Secretary Bernhardt did not meet these extensive and detailed requirements, the land exchange was not authorized.

Title XI prohibits any federal agency action "under applicable law" with respect to approval or disapproval of a transportation system within Alaska's conservation units, unless the agency complies with detailed, mandatory procedures. The Secretary did not comply with these procedures, and the majority excuses compliance because it thinks section 3192(h), the land exchange provision, is not an "applicable law" for the purposes of Title XI. Maj. Op. 23–25. An "applicable law" is "any law of general applicability" that provides an agency with jurisdiction "to grant any authorization (including but not limited to, any right-of-way, permit, license, lease, or certificate) without which a transportation or utility system cannot, in whole or in part, be established or operated." *Id.* § 3162(1). The majority asserts that section 3192(h) is not an "applicable law" under Title XI because it authorizes the agency only to exchange lands, not to build a road. *See id.* § 3192(h)(1); Maj. Op. 24–25.

Here, Secretary Bernhardt argues that section 3192(h) authorized him to agree to a land exchange for the express purpose of allowing KCC to build a road. As the district court stated, the land exchange "is the required first step in the completion of such a road." Without section 3192(h)'s purported authorization, the "transportation . . . system cannot, in whole or in part be established or operated," thus falling squarely within Title XI's definition of applicable law. *Id.* § 3162(1).

The majority concedes that the purpose of the transfer here is to build a road. Maj. Op. 24. It is not an answer to say that once the land is transferred out of the conservation unit, it will no longer be part of the conservation unit, and thus Title XI is inapplicable. *Id.* As the district court said, Congress's intent was clear—it enacted Title XI as a "single comprehensive statutory authority for the approval of"

transportation systems within conservation areas such as Izembek "to minimize the adverse impacts of sitting transportation . . . systems within units established or expanded by [ANILCA]. *Id.* § 3161. To make Title XI subject to the exchange provision would undermine that purpose. The express purpose of the land exchange is to remove the road corridor from the conservation system so that a road may be built—that is why Title XI's requirements apply. *See id.* § 3162(1). The 2019 Exchange Agreement expressly acknowledges that the land exchange "allows for construction of a road between King Cove and Cold Bay," and Secretary Bernhardt's memorandum lists the "acute necessity . . . for a road connecting King Cove and Cold Bay" as the first reason for entering the land exchange. This appeal demands that we determine whether the removal of this corridor from the conservation unit via a land exchange is proper, not whether a road would be permitted after the land exchange is approved.

Contrary to the majority's assertion, construing section 3192(h) to be an "applicable law" would not open the door for Title XI challenges to all section 3192(h) land exchanges. Maj. Op. 24–25. Title XI applies only to authorizations of transportation projects, *id.* § 3162(1), not all land exchanges are de facto "authorizations," and not every land exchange has the express purpose of serving as part of a transportation system. Thus, an agency considering an ANILCA land exchange need only comply with Title XI's procedures if the stated purpose for the land exchange is to authorize a transportation system.

Nor does the fact that KCC must still obtain permits before it may begin the road's construction alter the Title XI analysis. Maj. Op. 25. Title XI mandates that "no action by any Federal agency under applicable law with respect to the

approval or disapproval of the authorization, *in whole or in part*, of any transportation or utility system shall have any force or effect unless the provisions of this section are complied with."  16 U.S.C. § 3164(a) (emphasis added).  By including the clause "in whole or in part," Congress clarified that even partial authorizations of transportation systems must clear Title XI's requirements.  That is, even though KCC must still obtain the permits necessary for construction on the land corridor, the land exchange remains within Title XI's ambit as a partial authorization without which permits are irrelevant.  Because the agency failed to follow Title XI's requirements, the land exchange should be set aside.

For the foregoing reasons, I respectfully dissent.